IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 11, 2022 Session

**STATE OF TENNESSEE v. INMAN D. TURNER**

**Appeal from the Circuit Court for Rutherford County**
No. F-81316          David M. Bragg, Judge

_____

**No. M2020-01729-CCA-R3-CD**

_____

In 2019, the Appellee, Inman D. Turner, was charged in the Rutherford County Circuit Court with two counts of criminal sexual conduct and four counts of aggravated rape, Class X felonies, for offenses that allegedly occurred from 1978 to 1982. The Appellee filed a motion to dismiss the indictment for prosecutorial delay. The trial court held an evidentiary hearing and granted the motion, and the State appeals. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and Sharon L. Reddick and Hugh Ammerman, Assistant District Attorneys General, for the Appellant, State of Tennessee.

Luke A. Evans and Michael S. Hibdon (on appeal and at hearing), Murfreesboro, Tennessee, and Jennifer L. Thompson (at hearing), Nashville, Tennessee, for the Appellee, Inman D. Turner.

**OPINION**

**I. Factual Background**

On May 6, 2019, the Rutherford County Grand Jury returned a six-count indictment, alleging that the Appellee engaged in the unlawful sexual penetration of his daughter, who was born in July 1969. Counts one and two charged him with criminal sexual conduct in the first degree in violation of Tennessee Code Annotated section 39-3703. See Tenn.

Code Ann. § 39-3703(A)(1) (1978) (defining criminal sexual conduct in the first degree as sexual penetration with another person if the victim was twelve years of age or under). Counts three through six charged him with aggravated rape in violation of Tennessee Code Annotated section 39-3703. See Tenn. Code Ann. § 39-3703(a)(3) (1979) (defining aggravated rape as unlawful sexual penetration of another and the victim was less than thirteen years of age). According to the indictment, the offenses in counts one and two occurred between May 11, 1978, and June 4, 1979, and the offenses in counts three through six occurred between June 5, 1979, and July 23, 1982.[1] Criminal sexual conduct in the first degree and aggravated rape both carried maximum punishments of life in confinement and were classified as Class X felonies. See Tenn. Code Ann. §§ 39-3703(B) (1978), -3703(b) (1979); Barry W. Ritchie v. Westbrooks, No. E2012-00062-CCA-R3-HC, 2012 WL 3192109, at *1 (Tenn. Crim. App. Aug. at Knoxville, 6, 2012).

The Appellee filed several pretrial motions, including a motion for a bill of particulars and a motion to dismiss the indictment for prosecutorial delay due to the length of time between the commission of the alleged offenses and the return of the indictment. In a brief filed with his motion to dismiss the indictment, the Appellee recognized that his motion was based on due process grounds in which Tennessee courts generally have applied one of two tests: the test established by United States v. Marion, 414 U.S. 307 (1971), and State v. Dykes, 803 S.W.2d 250 (Tenn. Crim. App. 1990) (hereinafter referred to as the "Marion-Dykes test"), and the less-stringent test announced in State v. Gray, 917 S.W.2d 668, 673 (Tenn. 1996) (hereinafter referred to as the "Gray test"). The Appellee asserted that because the length of the delay between the commission of the alleged crimes and the return of the indictment was about forty years, which was similar to the forty-two-year delay in Gray, the trial court should apply the Gray test. The Appellee argued that under the Gray test, which required that the trial court consider the length of the delay, the reason for the delay, and the degree of prejudice to the Appellee, the trial court should grant his motion because allowing the prosecution to continue would result in fundamental unfairness and deny him of his right to a fair trial. See Gray, 917 S.W.2d at 673.

The State responded to the motion and asserted that because "the State," i.e., the Department of Human Services (DHS), investigated the victim's allegations and had knowledge of the offenses during the delay, the trial court should apply the Marion-Dykes test. The State argued that under the Marion-Dykes test, which required that the trial court consider the length of the delay, whether the Appellee was actually prejudiced by the delay, and whether the State caused the delay to gain a tactical advantage over the Appellee, the trial court should dismiss the motion because the Appellee could show neither prejudice

---

[1] Effective June 5, 1979, the offense of aggravated rape replaced the offense of criminal sexual conduct in the first degree. See 1979 Tenn. Pub. Acts 429, § 3; William Casey v. State, No. E2020-00701-CCA-R3-PC, 2021 WL 4773012, at *1 (Tenn. Crim. App. at Knoxville, Oct. 13, 2021).

nor intentional delay by the prosecution that caused tactical advantage. See Marion, 414 U.S. at 324; Dykes, 803 S.W.2d at 256.

The trial court held hearings on the motion on September 2 and September 18, 2020. During the first hearing, L.T. testified for the Appellee that she was his wife and that they had three children: a son, who was born in 1968; the victim, who was born in 1969; and a daughter, who was born in 1974.[2] L.T. said that one day when the victim was "[m]aybe in the 7th or 8th grade" at Roy Waldron Junior High School, the school's guidance counselor telephoned L.T. at home. The guidance counselor told L.T. that L.T. needed to come to the school to talk about the victim. When L.T. arrived at the school, the victim was sitting in a chair. L.T. said that "Ms. Richardson" was the guidance counselor and that Ms. Richardson told L.T. that the victim "had been inappropriately touched by her dad."

L.T. testified that she took the victim home and that she asked the Appellee "about this." The Appellee did not deny that he had touched the victim, so L.T. told him that "he better never touch her again." L.T. said she did not remember if she told him anything else. The next day, L.T. told the victim that "none of this was [the victim's] fault." A day or two later, the family made an appointment at "kind of like a counseling place." L.T. said that she did not remember the name of the counseling service but that it was located in Murfreesboro. However, the appointment was not going to take place for several weeks, so L.T. went to her medical doctor and told her doctor "what happened between . . . my daughter and her father." L.T. said that her doctor was a woman and that she thought her doctor's name was "Dr. Doyle," although she could not be sure. The doctor's office was on Hickory Hollow Parkway, and L.T. described how to get to the doctor's office from Interstate 40. L.T.'s doctor made a counseling appointment for the family at Luton Center. L.T. said that she did not remember any other details she may have told her doctor and that she did not remember if she took the victim to see a medical doctor.

L.T. said that a few days after she found out about the abuse, she told her son about it. Her son was angry with the Appellee. L.T., the Appellee, and the victim attended counseling together at Luton Center, and their counselor was Rebecca Marshall. L.T.'s son attended counseling with them one time. At some point, a DHS investigator contacted L.T. and wanted L.T. and the Appellee to go to the DHS office in Murfreesboro. L.T. said that she did not know the DHS investigator's name but that the investigator was a woman with short, dark hair. The DHS investigator also came to L.T.'s house and spoke with the victim in another room "for a long time." Defense counsel asked when that occurred, and L.T. responded, "It was warm weather. That's all I remember." She said that she no longer had any canceled checks to show she paid for counseling at Luton Center and that she did not have any records from Luton Center or DHS.

---

[2] In order to protect the victim's identity, we will refer to some of the witnesses by their initials.

L.T. testified that she and the Appellee were still married and that they had lived in the same three-bedroom house in La Vergne for about forty-eight years. L.T. and the Appellee slept in the master bedroom, the victim and L.T.'s youngest daughter slept in the second bedroom, and L.T.'s son slept in the third bedroom. The victim's bedroom was located between the other two bedrooms, and the victim always shared a bedroom with her sister. L.T. said that after she learned about the abuse, she "made sure that . . . the kids were never left alone with [the Appellee]." She also made sure her grandchildren were never alone with him.

L.T. testified that her memory of the events would have been better near the time they occurred and that she would have had records to show she paid for counseling at Luton Center. L.T. used to work as a substitute teacher at Roy Waldron Junior High School. She said that she did not remember the year she worked there but that it was "around" the time of the victim's disclosure. Bettye Greene was a teacher at the school, but L.T. did not remember if Ms. Greene was the victim's teacher.

On cross-examination, L.T. acknowledged that she confronted the Appellee with the victim's allegations. The Appellee "said that he was sorry." L.T. acknowledged that she did not remove the victim from "the situation" and that she allowed the Appellee to remain in the home. L.T. did not call the police because she "figured" the school would contact the police department. L.T., the victim, and the Appellee attended counseling sessions together at Luton Center because someone at DHS told them "that was . . . what we were supposed to do." L.T. did not remember who told her family to attend counseling. During the family's counseling sessions with Ms. Marshall, they talked about "how to keep the family together." L.T. said that she thought God wanted families to stay together and that she did not remember why her family stopped attending counseling.

L.T. testified that she did not remember when any of her children graduated from high school and that she did not keep a diary or journal. L.T. and her children always attended church, but the Appellee stayed home. L.T. said that the Appellee may have started attending church after the victim's allegations but that she could not remember. The State asked what church they attended, and L.T. said that she could not remember whether they attended Gilroy Church or La Vergne Church of Christ. L.T. attended church with an "older lady" named Ms. Dobson, but she could not remember Ms. Dobson's first name or the name of their church pastor.

L.T. testified that at the time of the victim's allegations, L.T. worked as a substitute teacher, and the Appellee worked from 7:00 a.m. to 3:30 p.m. She acknowledged that the Appellee was angry when he found out the victim had disclosed the abuse. At some point, the victim told her younger sister that the Appellee had sexually abused the victim. L.T.

said that she had been planning to tell her youngest daughter about the abuse when the child turned fourteen years old but that the victim "did it first." L.T. and her youngest daughter later agreed to protect her youngest daughter's children from the Appellee.

On redirect-examination, L.T. testified that Ms. Marshall told her never to leave her children alone with the Appellee. L.T. said she did not remember a lot of what the family talked about with Ms. Marshall because "it was so painful." On recross-examination, L.T. testified that Ms. Marshall "encouraged" her to keep her family together. L.T. denied that she was more concerned about keeping her family together than protecting the victim. She also denied knowing that the Appellee was abusing the victim prior to being contacted by the victim's school.

D.T. testified that he was the son of L.T. and the Appellee and that he was the victim's older brother. When D.T. was twenty-four years old, he married and moved out of his parents' home. At the time of the hearing, he was divorced and was living with his parents again. D.T. acknowledged having substance abuse issues and said that he had been in and out of treatment. At the time of the evidentiary hearing, he was sober and was "going back to meetings."

D.T. testified that he and the victim attended Roy Waldron Junior High School and that they had a "close" relationship. When D.T. was eleven, twelve, or thirteen years old, his mother told him that "dad had touched [the victim] in an inappropriate way." D.T said that his mother "broke down crying to pieces" and that he was "shocked" and "didn't know what to say." D.T.'s mother told him that the victim had reported the allegations at school, and D.T.'s mother "mentioned the Guidance Counselor."

D.T. testified that after he learned about the victim's allegations, he was angry with the Appellee and did not want to have anything to do with him. At the same time, D.T. did not know "whether it really happened or not." Within about a year, D.T. "got into drinking." He attended one counseling session with his parents and the victim at Luton Center, but he did not attend any additional sessions. He said that he did not remember the counselor's name and that he never saw anyone come to their house to talk with the victim.

Defense counsel asked if the victim was ever alone with the Appellee after the allegations surfaced. D.T. stated,

> No. It was kind of traumatizing to me that -- what happened. And I wanted to make sure nothing else like that happened again. And me and mom made sure that we all went to bed at the same time. You know, there wasn't ever -- [the victim] to be ever left alone again. Because there wasn't going to be no more chances for dad if it ever happened.

When D.T. was a child, he never confronted the Appellee about the victim's claims of sexual abuse, and he never spoke with the victim about her claims. He said the victim "kept it private to herself." D.T. stated that after his divorce, his sisters "turned against [him] and took [his] wife's side." He said he had not spoken with the victim in about five years.

On cross-examination, D.T. testified that he graduated from high school in 1986 and that the victim graduated in 1987. Both of them played sports in high school, and their parents disciplined them but were "forgiving." D.T. confronted the Appellee about the victim's allegations when D.T. was an adult in substance abuse treatment. D.T. told the Appellee that he was "very angry" with the Appellee, and D.T. was "able [to] finally get it off [his] chest." D.T.'s mother was present during the confrontation, but the victim was not present. D.T. acknowledged that his mother was the "spiritual leader of the family" but said that both of his parents attended church.

On redirect-examination, D.T. testified that he did not remember the Appellee ever physically disciplining the victim after the victim revealed the abuse. On recross-examination, D.T. testified that he did not think his mother would have allowed the Appellee to discipline the victim. D.T. said he had been in and out of substance abuse treatment about fifteen times. When his marriage failed, his parents allowed him to move back in with them. He said that he had been living with them since 2004 and acknowledged that they had supported him throughout his addiction.

Jacqueline Long testified that she was a health and physical education teacher at Roy Waldron Junior High School from 1977 to 1987. At some point, Ms. Long became aware of sexual abuse allegations made by the victim. Ms. Long explained, "It was in the 80's. That's all I can recall. But I remember the day." She then stated as follows:

> My classroom was diagonally across from Anna Lilly's classroom, and we did not have doors on those classrooms at that time. And at the end of class, Anna came out -- Anna Lilly came out and said that [the victim] said her dad had done something to her. And I glanced back at Anna's classroom, and [the victim] was visibly upset.
>
> And then the next thing, I saw [the victim's] mother walking down the hallway, because she was a substitute there, just shaking her head. And that's really all I remember.

Ms. Long said that she did not remember anyone else being present when she spoke with Ms. Lilly and that she thought Ms. Lilly taught eighth and ninth grade math. She said Ms. Lilly had since passed away.

Ms. Long testified that she thought the school's guidance counselor at the time of the victim's allegations was Mary Richardson. The victim's mother, L.T., worked as a substitute teacher in Ms. Long's class "at times," and Ms. Long considered L.T. to be a friend. Ms. Long said she did not remember if L.T. continued working at the school after the victim's allegations. She acknowledged that her memory of the events would have been better near the time of the events. On cross-examination, Ms. Long testified that she could not remember if Ms. Lilly said the victim claimed the Appellee "molested or just hurt" the victim.

Denise Sloan testified that she and the victim were best friends in elementary school and that they spent the night together often. One night when the victim was spending the night at Ms. Sloan's house and they were watching a movie, the victim told Ms. Sloan that the Appellee had been sexually abusing her. Ms. Sloan stated, "I don't remember the grade we were in. I don't remember the age we were. I have a range in my mind of a frozen moment, a frozen memory that I have that's very vivid." She said that she thought they were ten or eleven years old and in the fifth or sixth grade and that she thought the movie was "10 with Bo Derek" but that she could not be sure.

Ms. Sloan testified that during the movie, a scene of a man and woman having sexual intercourse was on the television and that the victim was crying. The victim told Ms. Sloan, "[T]hat's what my daddy does to me." Ms. Sloan told the victim that they needed to wake Ms. Sloan's parents and tell them; however, the victim told Ms. Sloan that "bad things would happen" if Ms. Sloan revealed the abuse. Defense counsel asked what the victim meant about "bad things," and Ms. Sloan responded, "That he would hurt her, and I could get hurt too." Ms. Sloan was scared and did not tell anyone. She stated,

> I didn't tell, and I should have. I should have woke my parents up at that very moment and told. But as a little girl that had just sat with a friend that had [said] something like that and was crying and was scared, I didn't want anything else to happen to her or anything to happen to me.

She reiterated that she remembered the victim's "exact" words: "That's what my daddy does to me."

Ms. Sloan testified that sometime when she was in the eighth or ninth grade, she was called into the main office at Roy Waldron Junior High School. L.T. was sitting in a chair in the office, and Ms. Sloan went into a room. Ms. Sloan said that "Mr. Brown," who

was the Assistant Principal, and "Ms. Lance" were in the room and that Mr. Brown asked Ms. Sloan "what [she] knew." Ms. Sloan told Mr. Brown about the "dirty movie" incident. Ms. Sloan said that she and the victim were in contact as adults but that they never talked about the details of the abuse and that "I don't even know why I got called to that office that day." No one ever asked Ms. Sloan about the victim again until many years later when a detective contacted Ms. Sloan.

On cross-examination, Ms. Sloan testified that she would go to the victim's home when they were children and that she never saw the Appellee do anything inappropriate to the victim. Nevertheless, Ms. Sloan said that her decision not to tell anyone about the sexual abuse was "a huge regret" and that she "[felt] a lot of guilt over it." Ms. Sloan stated that when she was called to the school office in eighth or ninth grade, "I know there were two people present. I know Mr. Brown was the person asking the questions. There was a woman in the room. For some reason, I do not remember it being Ms. Richardson. For some reason, I thought Ms. Lance was in the room[.]" After Ms. Sloan talked with Mr. Brown, she returned to class. Later that day, she told her parents about the Appellee's sexually abusing the victim. Ms. Sloan's father wanted to know if the Appellee had ever "touched" Ms. Sloan, and Ms. Sloan told him no. Ms. Sloan said that she initially thought she was called to the office when she was in the ninth grade; however, upon reflection, she later thought she may have been called to the office in the eighth grade. DHS never contacted Ms. Sloan about the victim's allegations, and the detective telephoned Ms. Sloan "within the past year, year and a half maybe." On redirect-examination, Ms. Sloan testified that her parents never contacted the police because they assumed the school would "handle[] it."

The victim testified that her first memory in life was of being at home alone with the Appellee when she was five years old, him putting his hands in her underwear, and her "feeling that it wasn't right." The incident happened in the living room, and the victim was wearing shorts. She acknowledged that it must have occurred during warm weather. The victim's mother was at church. When the victim's mother got home, the victim told her that "daddy put his hands in my panties." The Appellee told her mother that the victim's claim was "something silly kids say," and the victim's parents "laughed it off."

The victim testified that one day when she was in the seventh or eighth grade at Roy Waldron Junior High School, she "blacked out" at school. She was taken to the school office and spoke with Bettye Greene. Ms. Greene asked if something had happened at home and told the victim "that someone else had disclosed what [the victim] had said." The victim did not know who could have revealed the sexual abuse to Ms. Greene. The victim had disclosed the abuse to Denise Sloan but "didn't tell hardly anybody." The State asked if the victim remembered telling Paul Ewing about the abuse, and the victim said she did not remember telling him anything. She then stated, "He reached out to me on

Facebook after he saw the -- my Legislative testimony before the Tennessee Legislature and shared with me what he remembered. And I don't -- I don't remember ever telling him any of it."

The victim testified that when she spoke with Ms. Greene in the office, Ms. Greene asked her "if it was true." The victim acknowledged to Ms. Greene that the Appellee had been "molesting" her. However, the victim did not remember "in great detail" what she told Ms. Greene and did not remember if Ms. Greene asked her specific questions about intercourse or oral sex. The victim started crying and sat in the office for a long time by herself until her mother arrived and took her home. When the victim got home, the Appellee was in the hallway. The victim's mother told the victim and the Appellee that they "should apologize to each other" and "forgive each other" and that the victim should not have revealed the abuse because "we keep that between the family."

The victim testified that after she revealed the abuse to Ms. Greene, she wanted to go into foster care and take her younger sister with her. However, she remained in her parents' home, and no one ever came to speak with her. The victim said that she remembered going to Luton Center for one counseling session but that she did not remember meeting with Rebecca Marshall. During the counseling session, the victim sat between the Appellee and her mother and did not speak. The victim said that she thought the counseling session was "church affiliated" but that "I don't know why." The victim never met with a DHS investigator.

The victim testified that nothing changed at home after she disclosed the abuse to Ms. Greene and that she continued to be left alone with the Appellee. The victim said that the Appellee had sexual intercourse with her in the master bedroom and in her brother's bedroom and that "other sexual activity" occurred in her bedroom. The victim said the Appellee would come into her bedroom at night and would sexually abuse her. The victim's sister would be present "[s]ometimes" but would be asleep. Defense counsel asked if the Appellee had sexual intercourse with the victim in her bed, and the victim responded, "If he didn't have intercourse, he would -- it would be oral sex, or he would use his hands." The victim said there were "many instances" of sexual abuse in her bedroom.

The victim testified that she moved out of her parents' home in March 1987 before she graduated from high school. She moved in with her fiancé's family, who knew about some of the abuse, and married her fiancé the day after her eighteenth birthday in July 1987. At some point, the victim learned that her husband had sexually abused her younger sister when her younger sister was twelve or thirteen years old. The victim's parents "show[ed] up" at the victim's house to talk with her husband about the abuse, and the Appellee shook her husband's hand and told him that "it's okay we forgive you." The victim ended up divorcing her husband. In 2003, she married her second husband. The

victim said that she disclosed the abuse to her second husband "a few years ago" and that he was upset. At the time of the hearing, the victim and her second husband had been married seventeen years.

The victim acknowledged that in June 2018, thirty-one years after she moved out of her parents' home, she talked with Detective Matt Fracker about the abuse. She said, though, that she had "tried to tell in some form or capacity several times throughout [her] life." The victim wrote a statement for Detective Fracker in which she said she reported the abuse to Bettye Greene, who was the school guidance counselor. The victim testified, "I thought she was the guidance counselor. She was in the [guidance] office. I knew her to be a science teacher in junior high. But when I went to the office, she was the one in the office that was there. I don't know where Ms. Richardson was." Defense counsel asked why the victim waited until 2018 to report the abuse to the police, and the victim responded, "Well, nothing ever happened when I was five. Nothing happened when I was in junior high. I just thought I was supposed to live with it."

On cross-examination, the victim testified that the Appellee sexually abused her at least one time per month from the time she was five years old until she moved out of her parents' house. She said the abuse occurred more frequently as she got older, and she acknowledged that the Appellee abused her "hundreds" of times. The Appellee sexually penetrated her for the first time when she was eleven or twelve years old, and he continued to sexually penetrate her after she turned thirteen years old.[3] The victim said she could remember at least six specific instances of penetration in the timeframe alleged in the indictment. The Appellee told the victim not to tell anyone about the abuse or that she would be "grounded" and "in trouble."

The victim testified that the Appellee had "a really bad temper," that he "beat" her with a belt and threw her into a wall, and that she was afraid to tell anyone about the abuse. She said she heard her brother's testimony and that, despite his claim to the contrary, the Appellee was physically abusive. The victim said that her brother may not have been present when the Appellee physically abused her but that she saw the Appellee and her brother have "[f]ist fights." The victim's mother also was physically abusive and beat the victim one time with a wiffle ball bat. The victim's mother hit the victim's brother on his back with a frying pan one time and slapped his face "a lot."

The victim testified that the Appellee "used to work nights for a while" but that he "went to a different shift at Bridgestone." She said that she did not remember his employment history but that it was not unusual for him to be at home when she got home

---

[3] We note that the first two counts of the indictment allege penetration when the victim would have been eight to nine years old.

from school. The victim's mother attended church regularly, but the Appellee "hardly ever went to church when we were younger." The victim said she remembered the Appellee going to Gilroy Church of Christ with the family one time soon after she disclosed the sexual abuse to Ms. Greene. The victim stated that the preacher "pray[ed] over" the Appellee and that she thought the preacher was "cleansing" what the Appellee had done to her. The victim started crying, and her mother "slapped" her on the back of her head and said, "[S]top it, shut up. People are going to start asking questions." The victim said, "I knew in that moment that . . . this wasn't about protecting me." The victim said she did not remember what her family discussed during the counseling session at Luton Center because she "zoned out" to cope.

The victim testified that she did not report the abuse to the police earlier because she thought it was too late to hold the Appellee accountable. At some point, the victim saw a Facebook message posted by Representative Mike Sparks, with whom the victim had attended school. In the message, Representative Sparks wanted to know people's thoughts about changing the statute of limitations for victims of child sexual abuse. The victim sent him a "private message" and ended up testifying about her story in front of the Tennessee Legislature. The victim then went to the police, filed a report, and spoke with Detective Fracker.

The victim testified that she had been diagnosed with "some rare autoimmune diseases" and that "other victims of child sex abuse have some of these same illnesses." The victim stated that she had been "trying to figure out why I am so sick now" and that she "wondered if I was getting sick because of the stress that I had carried for so long, the secrets I had carried for so long."

On redirect-examination, the victim acknowledged that the Appellee "gave [her] away" at her wedding. She said he did so, though, because she was "pressure[d]." The victim said she did not reveal the abuse to the police until 2018 because she "didn't think anyone would do anything for me. They didn't already." However, she acknowledged that no one physically prevented her from disclosing the abuse.

At the second hearing, Paul Ewing testified for the Appellee that he dated the victim when they were students at Smyrna High School. The victim was a sophomore, and Mr. Ewing was a senior. He said that in the summer of 1984 or 1985, the victim told him about "the abuse that she went through." The victim told Mr. Ewing that "it started at an early age where it was a lot of touching that led into oral sex" but that the abuse had stopped. Mr. Ewing said he thought the victim was attending counseling, but he did not remember if she was attending counseling alone or with her parents.

Mr. Ewing testified that the victim claimed the Appellee had forced her to engage in fellatio and that he asked her about sexual intercourse. Mr. Ewing said that "it was too much for her to talk about" but that she "never denied it." The victim told Mr. Ewing that she had tried to tell her mother about the abuse but that her mother was "in denial." The victim's mother told her that "she shouldn't be talking about [it] to other people or anyone at all." The victim later ended her relationship with Mr. Ewing, but Mr. Ewing could not remember when she broke up with him. He lost contact with her for about thirty years, but they reconnected on Facebook. Mr. Ewing told the victim what she had said about the abuse when they were dating, and she asked if he would be willing to testify for her.

Bettye Greene testified that she worked at Roy Waldron Junior High School from 1976 to 2003. Ms. Greene started working there as a middle school science teacher but became the school guidance counselor "maybe fall of '85. . . . I'm not 100 percent sure." She said that L.T. was "a very dependable substitute" teacher at the school and that they saw each other occasionally but were not friends. She said that she was "not sure" she remembered the victim and that "I remember her younger sister more than I remember her."

Ms. Greene testified that if a student had revealed sexual abuse to her while she was a teacher, she would have taken the student to the guidance counselor. The guidance counselor would have contacted DCS. She said that if the abuse had involved a teacher at the school, she "would have probably talked to the principal first." Ms. Greene said that she did not remember the victim telling her about any sexual abuse and that "I think I would have remembered that." Defense counsel asked if Ms. Greene would have "covered that up," and she responded, "Absolutely not."

Mary Richardson testified that she was the guidance counselor at Roy Waldron Junior High School from 1977 to 1985 and that she did not remember the victim. However, she explained what she would have done if the victim had disclosed sexual abuse to her:

> Typically, back in the day -- and we're talking a long, long time ago -- we would call the Department of Children Services, D.C.S. And, usually, I would call, and we would wait until someone would come to the school to talk to the student. So, typically, D.C.S. would be the go-to person.
>
> . . . .
>
> [I]f the student came to me, then I would, again, call D.C.S. If a teacher came to me and confided that a student had been abused, then, again, I would have to call D.C.S. That would be the bottom line.

Ms. Richardson denied that she would have "swept something like that under the rug."

On cross-examination, Ms. Richardson testified that she did not remember the victim's name or the victim's family. Ms. Greene succeeded Ms. Richardson as the school guidance counselor, but Ms. Greene never "filled in" for Ms. Richardson while Ms. Richardson was the guidance counselor but was not present at the school.

L.A., the victim's younger sister, testified that she and the victim shared a bedroom until the victim moved out of their parents' home. They slept in the same bed, and L.A. thought their bed was a "water bed." The bed was not a twin bed, but L.A. could not remember the bed's actual size. She acknowledged that she would have had a better memory "then than now."

L.A. testified that when she was seventeen or eighteen years old, her mother or the victim told her that the Appellee had sexually abused the victim. L.A. never witnessed the abuse. She said she was not alone with the Appellee on a regular basis but recalled being alone with him one time in high school and feeling "very uncomfortable." She said that there was "a lot of fighting" between her parents when she was growing up and that the fights were physical. Defense counsel asked how often her parents fought, and she stated, "I would say it's a lot more than a couple of times that I remember." The Appellee would get very angry at L.A.'s mother and would pull her mother's hair. L.A. said she also heard a lot of "yelling" and saw a lot of "pushing." She said that she did not remember seeing any violence between the victim and the Appellee but that she saw the Appellee and her brother get into "a couple of physical fights."

L.A. testified that she never attended any counseling sessions while the victim was still living at home. Regarding the Appellee's sexual abuse of the victim, L.A. stated, "I was just told that something happened between [the victim] and dad, and it was inappropriate, and we were just not to talk about it." She said that in the past four or five years, she and the victim had had "[m]ultiple conversations" about the abuse; however, the conversations "never really went anywhere, because [the victim] just didn't want to share the details." L.A. thought that the abuse was "something painful" for the victim and that the victim "didn't really want to talk about it." L.A. stated that "[t]here's always been this anger between my mom and my sister and my dad. . . . I was always the go-between." L.A. said that she tried to understand why the victim was so angry with their parents and that "now I understand why."

L.A. testified that over the years, her family would get together at her parents' house or the victim's house. At some point, though, the get-togethers stopped because the victim moved out of state. L.A. said that the interactions between the victim and the Appellee were "[v]ery odd" and that "[t]here were not like a lot of hugs or anything like that." L.A.

stated that the victim was angry "because of the way we grew up" and that L.A. and her siblings were supposed "[t]o act like the abuse [between the Appellee and the victim] didn't happen, and to be quiet and act like our family is perfect." L.A. said she confronted her mother about the abuse about five years ago. Her mother told her that "the best thing [she] knew to do, was just to keep the family together." L.A. never confronted the Appellee about the abuse.

On cross-examination, L.A. testified that she was seven years younger than the victim and that she did not sleep with the victim as a baby. L.A. and the victim slept in the same bed when the victim was a teenager. L.A. said that when she spoke with her mother about the abuse, her mother "agreed that something [had] happened." However, they never talked about "the details." At some point, though, L.A. and her mother agreed that the Appellee would not be alone with L.A.'s daughters. L.A. acknowledged that she thought it was important to keep the Appellee away from her daughters when they were children.[4]

The State asked L.A. to recall the time she was alone with the Appellee and "felt uncomfortable." L.A. testified that one day when she was in high school and came home from softball or volleyball practice, her back was hurting. The Appellee told her to "lay down, he would rub [her] back." The Appellee put his hand up the back of her shirt, unfastened her bra, and started rubbing her back. At that time, L.A. did not know the Appellee had sexually abused the victim. Nevertheless, L.A. "immediately started feeling uncomfortable" and "immediately got up and left the room." She acknowledged testifying on direct examination that she did not remember seeing any violence between the victim and the Appellee. She acknowledged, though, that she saw the Appellee on top of the victim one time. The Appellee was physically assaulting the victim, and L.A.'s brother had to pull the Appellee off the victim. L.A. also saw her mother "beat" the victim one time with a wiffle ball bat. L.A. said she got the "impression" from her mother that they were not supposed to talk with other people about the abuse. Regarding the discipline her parents administered in their home, L.A. stated, "I had spankings with a belt, switches in the yard, grounding. I was smacked in the face." She described the discipline as "normal" for her and her siblings.

On redirect-examination, L.A. testified that the victim's first husband sexually abused L.A. L.A. disclosed the abuse to the victim, and the victim divorced him a year or two later.

Detective Matt Fracker of the La Vergne Police Department testified that a couple of years before the hearing, he was notified that someone in the lobby of the police department wanted to speak with him. He said that he met with the victim and that "she

---

[4] At the time of the hearing, L.A.'s daughters were twenty-one years old.

told me that she wanted to file a report for [sexual abuse] that had happened with her father years ago." The victim gave Detective Fracker a written statement in which she claimed that the Appellee had sexually abused her from the ages of five to seventeen and that she had revealed the abuse to Bettye Greene. Detective Fracker met with an assistant district attorney general about the allegations. Detective Fracker was concerned the statute of limitations had expired but later learned the case could proceed.

Detective Fracker testified that he had the victim wear a "wire" and telephone the Appellee to confront him about the abuse. Another officer listened to the conversation "in real time." Detective Fracker interviewed the victim's parents; the victim's friend, Denise Sloan; and the victim's ex-boyfriend, Paul Ewing. Detective Fracker said that given the amount of time that had passed, he did not know how to find Ms. Greene or if she was even alive and that he did not attempt to obtain the victim's school records. The victim's parents told Detective Fracker that DHS had been involved in the case and that the family had attended counseling. Detective Fracker contacted DCS, which would have been DHS when the victim was in junior high school, and learned that any records had been destroyed. He did not know the counselor's name, so he did not try to obtain any counseling records. He thought the victim said that her mother had taken her to a medical doctor. However, Detective Fracker did not think the victim gave him the doctor's name, so he did not try to obtain any medical records.

On cross-examination, Detective Fracker acknowledged that children often delayed disclosing sexual abuse and that delays caused the loss of physical evidence, such as DNA, and the inability for witnesses to recall events. He said that in such cases, the only evidence usually available was statements made by a victim and a defendant and controlled calls made by a victim to a defendant. On redirect-examination, Detective Fracker acknowledged that due to the extreme delay in this case, no physical evidence, no medical evidence, and no school or DHS records existed.

Dr. Lisa Milam, a forensic social worker for Our Kids Center in Nashville and a former investigator for DHS, testified as an expert in child sexual abuse that "a large percentage" of child sexual abuse victims either delayed revealing the abuse or did not reveal the abuse at all. She cited a 2014 article titled "Adult Disclosure of Child Sex Abuse, a Literature Review," which stated that almost thirty percent of child victims did not reveal the abuse until they were adults. Dr. Milam stated that it was not unusual for parents of her patients to tell her for the first time that they had been sexually abused as children and that child victims often delayed disclosure due to shame, fear, or cultural factors. According to at least one research article, lack of support also contributed to a child's failure to disclose sexual abuse. Dr. Milam explained,

You know, children gauge what they think the reaction of a parent is going to be. And there's actually other research around that that children are pretty accurate in their ability to gauge what the parental reaction will be. And if they perceive it as something that may be negative or conflicted, they are less likely to make a report.

She said that for children who disclosed abuse, some of them discovered that "the distress of all of that essentially created a scenario where retreat and silence was the only option just to keep the peace in the family."

Dr. Milam testified that "survivors" of child sexual abuse almost never contacted law enforcement and that "older" children and adults usually disclosed the abuse to a close friend, an intimate partner, a therapist, or a healthcare provider. She said it would not surprise her to learn that a survivor waited well into adulthood to contact law enforcement. She stated that fear for the safety of other children often prompted survivors to report abuse and that holding someone accountable was a "powerful source of healing" for adult survivors.

Dr. Milam testified that "very specific protocols and policies" for DHS's handling of child abuse cases were implemented in 1986 or 1987 and that "[w]hat went on in the '80's is very different than what happens now." She stated that when she began working for DHS in 1988, she would visit a home or a school to ask a child questions, to question a parent, and to determine if the child had sustained any physical injuries. For sexual abuse cases, DHS investigators were expected to work with law enforcement. However, law enforcement did not always get involved in a case. For example, if a DHS investigator received a referral at night or early in the morning, the DHS investigator may have investigated the case alone because an investigating police officer was unavailable. Each DHS investigator handled cases differently, and law enforcement may not have been contacted if a DHS investigator went to a school.

On cross-examination, Dr. Milam testified that she never worked for DHS in Rutherford County and that she did not know anything about the victim's case. She said that she would not have talked with a child in the presence of a parent and that she would have taken the child into another room. She also would have consulted with a supervisor prior to removing a child from a home. She said that she and the other DHS investigators she worked with typically "err[ed] on the side of caution" but that she "probably" made errors in judgment "one way or the other." Dr. Milam may have suggested counseling to a family, and DHS referred families to counseling at Luton Center. She stated that the harm caused by child sexual abuse was "overwhelming" and that adult survivors were prone to health issues such as diabetes, heart disease, and cancer. Upon being questioned

by the trial court, Dr. Milam testified that she thought the mandatory reporter law, which required that everyone report child abuse, was passed in 1986.

By agreement of the parties, defense counsel introduced into evidence an affidavit signed by Rebecca Marshall and dated September 18, 2020. In the affidavit, Ms. Marshall stated that she was retired but that she used to work as a clinical therapist for Luton Mental Health Services, which later became Centerstone of Tennessee. While Ms. Marshall was working at Luton Mental Health, she met with the Appellee, who had been accused of "inappropriate sexual conduct with his daughter." Ms. Marshall did not remember "the extent or the specific details of the alleged conduct," but she recalled that the Appellee "was one of the first I had seen for such allegations." She said that her memory of him was "not a pleasant one" and that

> [t]he little that I do remember was that it was not a good situation and my initial memory was that DCS had not done their job in the case, though I honestly cannot remember why I felt that way. I cannot state what DCS did or did not do in this case.

Ms. Marshall said that the Appellee would have been referred to her by "DCS/DHS or the criminal justice system" and that she "may have seen the family together at the initial visit if it had been listed as a family therapy appointment." However, she would not have counseled the Appellee and the victim together and would have referred the victim to another counselor if necessary. Ms. Marshall did not remember how long she counseled the Appellee and did not remember "the outcome of the matter." She said her knowledge about the Appellee would have been more accurate if she had been asked about his case closer to the time of the events.

On December 1, 2020, the trial court entered a written order granting the Appellee's motion to dismiss the indictment for prosecutorial delay. In the order, the trial court noted that DCS, the Rutherford County School Board, and Centerstone had responded to subpoenas and had advised the trial court that they were no longer able to provide any records for the victim or her parents. The trial court summarized the facts presented at the hearing and found that the victim first reported the abuse to her mother when she was five years old and that the victim reported the abuse again to someone at her junior high school when she was in the seventh or eighth grade. The trial court further found that after the disclosure at school, DHS interviewed the victim and her mother, and the Appellee was referred to counseling at Luton Center.

The trial court found that the victim disclosed the abuse "to other individuals on numerous occasions following her disclosure at school" but that she "failed to take any steps to initiate a formal prosecution" of the Appellee from the time she moved out of his

home in 1987 until she notified law enforcement in June 2018. The trial court also found that the victim's reason for failing to notify law enforcement earlier was that "she did not think anyone would do anything about it." The trial court concluded that the delay was due to the State's failure to prosecute the case following the victim's disclosure at school but determined that Gray was the correct test to use in this case because "[t]he clear language of [Gray] defines pre-accusatorial delay as the time between the commission of the offense and its disclosure to law enforcement."

The court then considered the prongs of the Gray test: (1) the length of the delay; (2) the reason for the delay; and (3) the "most important prong," the prejudice to the Appellee. The trial court found that the alleged offenses occurred between 1978 and 1982 but were not disclosed to law enforcement until 2018, a delay of about forty years. The trial court described the length of the delay as "excessive" and found that the State did not give a reason for the delay. Regarding prejudice, the trial court found that the Appellee had shown that "multiple witnesses who would have been available closer in time are now deceased"; that "the memories of the living witnesses have faded over the last forty or so years"; and that DHS, school, and counseling records related to the case had been destroyed. The trial court concluded that based on the diminished memories of the living witnesses, including the victim; the unavailability of material witnesses; and the destruction of material evidence, prosecution of the Appellee would violate due process. Accordingly, the trial court granted the Appellee's motion to dismiss the indictment for prosecutorial delay.

## II. Analysis

The State claims that the trial court erred by applying the Gray test and by granting the Appellee's motion to dismiss the indictment. The State contends that because "the State," i.e., DHS, had knowledge of and investigated the victim's allegations and because the Appellee was not denied his ability to prepare a defense, the trial court should have applied the Marion-Dykes test. The State also contends that under either the Gray test or the Marion-Dykes test, the trial court erred by finding that the Appellee demonstrated prejudice. The Appellee argues that the trial court properly applied the Gray test and that the trial court did not abuse its discretion by granting his motion. We agree with the Appellee.

We review a trial court's ruling on a motion to dismiss the indictment for an abuse of discretion. State v. Harris, 33 S.W.3d 767, 769-70 (Tenn. 2000). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." State v. Phelps, 329 S.W.3d 436, 443 (Tenn. 2010).

In Marion, the United States Supreme Court stated that "[t]he Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay . . . caused substantial prejudice to the [defendant's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." 404 U.S. at 324. In light of Marion, this court articulated in Dykes what became known as the Marion-Dykes test:

> Before an accused is entitled to relief based upon the delay between the offense and the initiation of adversarial proceedings, the accused must prove that (a) there was a delay, (b) the accused sustained actual prejudice as a direct and proximate result of the delay, and (c) the State caused the delay in order to gain tactical advantage over or to harass the accused.

803 S.W.2d at 256.

In Gray, the defendant was indicted in 1992 for carnal knowledge of a female under the age of twelve that allegedly occurred in 1950. 917 S.W.2d at 669. He moved to dismiss the indictment for prosecutorial delay, the trial court held a hearing and granted the motion, and this court reversed the trial court, finding the third prong of the Marion-Dykes test dispositive because there was no evidence that the State had contributed to the delay. Id. at 669-71. On further appeal, our supreme court distinguished Gray's case from Dykes. Id. at 671. Specifically, our supreme court noted that the delay between the alleged crime and the indictment in Dykes was about one year, whereas the delay between the alleged crimes and the indictment in Gray's case was forty-two years. Id. Moreover, our supreme court noted that in Dykes, "the State" had knowledge of the offense from the time it was committed, whereas no such knowledge existed in Gray's case. Id. Therefore, the court found that the Marion-Dykes test was inappropriate to use in Gray. Id.

Our supreme court then set out to articulate, under the unique facts Gray's case, "the appropriate standard by which to measure pre-accusatorial delay—the period of time between the commission of the offense and its disclosure to law enforcement authorities." Id. at 672 (emphasis added). In doing so, the court said that it was "reluctant" to assess the delay under the limited due process standard established in Marion because there was no statute of limitations for the offense in Gray's case to protect him from "prejudice possibly inherent in the delay." Id. at 673. The court also observed that the Marion-Dykes test was "extremely one-sided" in that it placed "a daunting, almost insurmountable, burden on the accused by requiring a demonstration not only that the delay has caused prejudice but also that the State orchestrated the delay in order to obtain a tactical advantage." Id. The court then stated as follows:

- 19 -

Today we articulate a standard by which to evaluate pre-accusatorial delay and hold that an untimely prosecution may be subject to dismissal upon Fifth and Fourteenth Amendment due process grounds and under Article I, §§ 8 and 9, of the Tennessee Constitution even though in the interim the defendant was neither formally accused, restrained, nor incarcerated for the offense.

Id. Consequently, the court pronounced an alternative, less-stringent test requiring that the trial court consider (1) the length of the delay, (2) the reason for the delay, and (3) the degree of prejudice, if any, to the accused. Id. Prejudice to the accused is the most important factor, although it is not determinative in every case. State v. Carico, 968 S.W.2d 280, 285 (Tenn. 1998). Subsequently, our supreme court limited the Gray test to cases in which the State had no knowledge of the offense. State v. Utley, 956 S.W.2d 489, 495 (Tenn. 1997) (stating that "given the unique facts in Gray, we held that in analyzing a pre-accusatorial delay during which the state was unaware of the commission of the crime, the trial court must consider only the length of the delay, the reason for the delay, and the degree of prejudice").

Applying the new test, our supreme court found that the length of the delay in Gray's case was "profoundly excessive." Gray, 917 S.W.2d at 673. Regarding the reason for the delay, the court found that no reasonable justification for the delay had been demonstrated. Id. As the court explained,

[The victim] has accused Gray of sexually penetrating her when she was eight years old in early 1950. She testified that for more than forty years—until March 26, 1992—she kept her silence about the incident. There is no evidence in the record that Gray tried to conceal his alleged conduct or that he threatened the victim in any way. [The victim] testified that she had been "bothered" by her memory of the incident throughout her childhood and adult life. Finally, the record shows that she continued to interact with the defendant through the years. Under these facts, the trial court correctly held that forty-two years "is much too long to wait before prosecuting an alleged offense where the prosecutor [victim] is of legal age for the great majority of this time. . . ."

Id. at 671-72.

Finally, our supreme court found that Gray had made "a prima facie showing of prejudice" because the evidence in the record revealed that the lapse of time had diminished the victim's memory, that witnesses thought to be material were unavailable, and that the "the victim cannot specifically date the incident, thereby requiring Gray to account for his

- 20 -

whereabouts and his conduct during a six-month period forty-two years past." Id. at 673. Accordingly, our supreme court reversed this court and reinstated the trial court's dismissal of the indictment. Id. at 674.

Turning to the present case, the State claims that opinions issued after Gray have held that notification to DHS or DCS is sufficient to support application of the Marion-Dykes test. In State v. Carico, the victim notified her school in 1985 that the defendant was sexually abusing her. 968 S.W.2d at 283. The school notified DHS, and DHS began an investigation. Id. DHS "'substantiated'" the victim's allegations and reported the results of its investigation to the district attorney general, but the victim recanted her allegations, so the district attorney general decided not to prosecute the defendant at that time. Id. The victim renewed her allegations in 1991, and an indictment was returned in 1993. Id. Our supreme court noted that Utley limited the Gray test to cases in which the State had no knowledge of the offense, and the court applied the Marion-Dykes test. Id. at 284-85. The court stated that "the delay of more than seven years from the time the offense was reported to [DHS] until the prosecution was commenced" warranted due process analysis. However, the court later found that "although the delay in initiating adversarial proceedings against the appellant was excessive, it was not so long that the delay alone entitles the appellant to relief." Id. at 286 (emphasis added). Given that the district attorney general in Carico clearly had knowledge of the offenses in 1985, the trial court properly applied the Marion-Dykes test.

In State v. Gwendolyn Hagerman, another child sexual abuse case, the offenses were committed in August and December 2004, they were reported to DCS in May 2008, and a presentment charging the defendant with raping the victim was returned in October 2009. No. E2011-00233-CCA-R3-CD, 2013 WL 6729912, at *34 (Tenn. Crim. App. Knoxville, Dec. 19, 2013). In assessing whether the pre-accusatorial delay violated due process, this court applied the Marion-Dykes test. This court found that there was an approximate seventeen-month delay "between the report [to DCS] and the return of the presentment on October 27, 2009." The opinion reflects, though, the Bristol Police Department began investigating the victim's allegations just "one or two days" after DCS became aware of her allegations. Id. at *5. Therefore, law enforcement also had knowledge of the offenses. In sum, Carico and Gwendolyn Hagerman are not on point with this case, and neither opinion specifically addressed whether DHS or DCS was "the State" for purposes of determining whether prosecutorial delay constituted a due process violation.

Moreover, DHS's investigation of the victim's allegations in this case was tenuous at best. Pursuant to the child abuse law that was in effect during most of the time that the victim was in the seventh and eighth grade, which the trial court correctly calculated as 1981 to 1983, a DHS investigation of child abuse was supposed to include a visit to the child's home; a physical and psychological or psychiatric examination of the child; similar

examinations of other children in the home if the investigator deemed them necessary; and an interview with the child. Tenn. Code Ann. § 37-1206(c) (1977). DHS then was supposed to make "a complete written investigation report, including its recommendations, to the juvenile court." Tenn. Code Ann. § 37-1206(e) (1977). Effective May 26, 1983, the statute for DHS investigations of child abuse was amended to require an interview with and a physical examination of the child, an interview with the child's parents, and an interview of any other persons in the child's home. See Tenn. Code Ann. § 37-1206(c) (Supp. 1983). Furthermore, "child abuse review teams," which were comprised of a DHS representative, a physician, a psychologist or psychiatrist, and a social worker were required to review "all cases in which the investigation of [DHS] has resulted in a finding of child abuse in its report to the juvenile court." Tenn. Code Ann. § 37-1207 (Supp. 1983).

Here, the victim's mother testified that she and the Appellee went to the DHS office in Murfreesboro and that a DHS investigator met with the victim in their home. However, nothing indicates that a DHS investigator "substantiated" the victim's allegations or that a child abuse review team reviewed her case at any time. What's more, DHS records that could have shed light on the extent of DHS's investigation no longer exist.

The State further contends that Marion-Dykes was the correct test to apply in this case because DCS has been found to be the equivalent of "law enforcement" for purposes of Ferguson violations and because DCS information falls within the State's Brady obligation. In State v. Ferguson, our supreme court held that the State generally has a duty to preserve all evidence subject to discovery and inspection under Tennessee Rule of Criminal Procedure 16 "or other applicable law." 2 S.W.3d 912, 917 (Tenn. 1999). Since Ferguson, this court has repeatedly held that the duty to preserve evidence extends to DCS. See State v. Daniel E. Pottebaum, Sr., No. M2004-02733-CCA-R3-CD, 2006 WL 1222710, at *14 (Tenn. Crim. App. at Nashville, May 5, 2006) (citing State v. Matthew Kirk McWhorter, No. M2003-01132-CCA-R3-CD, 2004 WL 1936389, at *26 (Tenn. Crim. App. at Nashville, Aug. 30, 2004); State v. Cory James Martin, No. E2001-00914-CCA-R9-CD, 2002 WL 927427, at *5 (Tenn. Crim. App. at Knoxville, Sept. 9, 2002); State v. Ammon B. Anderson, No. M2000-01183-CCA-R3-CD, 2001 WL 363984, at *5 (Tenn. Crim. App. at Nashville, Apr. 12, 2001)). However, while DCS has a general duty to preserve evidence, a Ferguson analysis is only triggered if the alleged exculpatory evidence is determined to be material. Ferguson, 2 S.W.3d at 917.

In Brady v. Maryland, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 (1963). Additionally, "Brady applies not only to evidence in the prosecution's possession, but also to 'any favorable evidence known to the others acting on the government's behalf in the case, including the

police.'" State v. Jackson, 444 S.W.3d 554, 594 (Tenn. 2014) (quoting Strickler v. Greene, 527 U.S. 263, 275 n.12 (1999)). As noted by the Appellee, though, even if DCS records contain Brady material, a defendant has limited access to such records. See Charles Ritter v. State, No. E2008-01278-CCA-R3-PC, 2009 WL 3711991, at *8 (Tenn. Crim. App. at Knoxville Nov. 6, 2009) (stating that under Pennsylvania v. Ritchie, 480 U.S. 39, 60 (1987), "a DCS file may be submitted to a trial court for in camera review, and if a defendant is aware of specific information in the file, he may request it from the court and argue its materiality).

Although the State argues that DHS's knowledge of the victim's allegations required that the trial court apply the Marion-Dykes test, the third prong of that test, i.e., that the State caused the delay in order to gain tactical advantage over or to harass the accused, is particularly perplexing to this court. As another panel of this court has recognized, "[W]e question whether in reality the Marion-Dykes rule affords a defendant meaningful protection of his due process right to a fair trial in the face of unreasonable and unjustified pre-indictment delay." State v. Ahmad R. Manning, No. E2011-01812-CCA-R3-CD, 2013 WL 794154, at *6 (Tenn. Crim. App. at Knoxville, Mar. 4, 2013); see State v. Randall Louis Ivey, No. 01C01-9808-CR-00347, 1999 WL 618884, at *2 (Tenn. Crim. App. at Nashville, Aug. 11, 1999) (stating that "requiring the defendant to prove the state's motives can be viewed as an unjustifiably high burden").

In any event, the case before us is strikingly similar to Gray in that it involves allegations of child sexual abuse in which there are no statute of limitations to protect the Appellee against prejudice possibly inherent in the delay. We note that our Code now provides that prosecution for rape of a child and statutory rape by an authority figure must commence "no later than twenty-five (25) years from the date the child becomes eighteen (18) years of age."[5] Tenn. Code Ann. 40-2-101(h)(2), (i)(1) (Supp. 2021). This case also involves a profoundly excessive pre-accusatorial delay, forty years from the time of the earliest offenses to the victim's disclosure to law enforcement. Although DHS was aware of the victim's allegations and may have interviewed the victim and her mother, the record is devoid of evidence regarding any further extent of the agency's investigation. Therefore, we conclude that the Gray test was the more appropriate test to apply in this case.

Regarding the reason for the delay, the victim testified that she was afraid to reveal the abuse because the Appellee threatened to harm her if she told anyone. Her testimony

---

[5] Relevant to this case, rape of a child is defined as sexual penetration of a victim by the defendant if the victim is more than eight but less than thirteen years of age. Tenn. Code Ann. § 39-13-522 (Supp. 2021). Statutory rape by an authority figure is defined as unlawful sexual penetration of a victim by the defendant when the victim is at least thirteen years old but less than eighteen years old, the defendant is at least four years older than the victim, and the defendant, at the time of the offense, had parental authority over the victim. Tenn. Code Ann. § 39-13-532(a)(1), (2), (3)(A).

- 23 -

was supported by her sister, who testified that the Appellee was physically abusive. That said, the victim found the courage to reveal the abuse when she was in the seventh or eighth grade. However, the victim turned eighteen years old in 1987, moved out of her parents' home before her eighteenth birthday, and married her first husband the day after her eighteenth birthday. The Appellee even gave the victim away at her wedding. The victim continued to interact with him and waited an additional thirty-one years as an adult to report the abuse to the police. The victim explained that she did not contact law enforcement earlier because she did not think anyone would help her. Given the disturbing testimony at the evidentiary hearing, particularly that the victim's mother did not contact the police and allowed the Appellee to remain in the home even though the Appellee admitted touching the victim, we can understand the victim's belief that the Appellee would never be held accountable and her apprehension in reporting the abuse to law enforcement. However, we must conclude that alone was not reasonable justification for such a profoundly excessive delay.

As our supreme court found in Gray, we also think the Appellee has made a prima facie showing of prejudice. School, DHS, and medical records that would have shed light on material information related to this case, such as when the victim reported the allegations at school and to whom, have been destroyed. At least one material witness, Ms. Lilly, is deceased,[6] and the lapse of time has diminished the memories of all of the surviving witnesses, including the victim. Neither Ms. Greene nor Ms. Richardson have any memory of the victim's allegations. Furthermore, the Appellee would have to account for his whereabouts and his conduct six times during a four-year period thirty-seven to forty-one years ago, an even more daunting task than the defendant was facing in Gray.

The State asserts that "[w]hatever defense was available to [the Appellee] then has not been shown to be unavailable now" and that "it is not unreasonable to conclude that the missing records and witnesses would now, if available, likely be more harmful than helpful to the [Appellee]." The State also asserts that the victim's mother's testimony does not suggest the Appellee would use an alibi defense at trial and that the evidence at trial likely would center around credibility. However, such assertions are pure speculation. We note that at the time of the evidentiary hearing, the State had not provided the Appellee with a bill of particulars, so he had very little information to consider possible defenses.[7] Therefore, we conclude that the trial court did not abuse its discretion by granting the Appellee's motion to dismiss the indictment.

---

[6] According to the trial court's order dismissing the indictment, Mr. Brown also was deceased.

[7] During the hearing, the State advised the trial court that it was going to provide the Appellee with a bill of particulars.

## III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE